May it please the Court, my name is Jeffrey Dickerson, representing the appellant, Gary Gray, in this particular matter. We're on appeal from the grant of a summary judgment in a Title VII retaliation case under Section 2000E-3. The protected activity that I'd like to focus on today is the filing of the NERC EEOC charge of discrimination in July of 2004 as the protected activity. And I would also like the Court to focus today upon the termination as the adverse action that is worthwhile considering because it is the most grave adverse action. The – but just before moving forward into that discussion, the brief and below placed into factual context the historical development of the protected activity and the historical development of prior adverse actions in order to give the Court below and the Court here a context in which to evaluate, in particular, Mr. Christie's action, because he was the target of the reporting activity back in May of 2004. With that said, let's proceed into the analysis of the termination. No doubt that's an adverse action under the law, so that's a given. And no doubt his charge of discrimination in July of 2004 was protected activity. So the question focuses upon what evidence of causation is there, and we have the temporal proximity of approximately 7 months. We have the fact that Mr. Cole, who made the recommendation for termination, testified in his deposition that Paige Conner, the human resource person, discussed with him the history of Mr. Gray. And I asked if that was his performance history, and they briefly mentioned that in terms of it was good, but there had to be more discussed of his history other than just performance, given that testimony. And Paige Conner, according to Mr. Cole, told him that he had filed, that Mr. Gray had filed an EEOC charge in the summer of 2004, 7 months earlier. So we have evidence in terms of causation, not only of temporal proximity, but in connection with the termination decision-making discussion of the protected activity itself. This, we suggest to the Court or argue to the Court, creates a reasonable inference of causal connection between the protected activity in July of 2004 and the adverse action in February of 2005. Counsel, I think you have a substantial hurdle here. He was fired for a reason which was an absolute rule. If you don't follow that procedure, you're to be fired. And there was one other employee who likewise was fired. So how do you get over that hurdle? Thank you, Justice Fletcher. Judge Fletcher, that takes us into the next argument, which is about pretext. And according to Mr. Gray, what he had told, and this is they argue that there's an inconsistency here, but there is no inconsistency. His declaration is consistent with his testimony at deposition that what he admitted to when he was interviewed, they asked him if he locked out and tagged out or if he violated that procedure. And he said, I believe I told them and I've been guilty of that in the past. And his clarification in his declaration and in his deposition testimony taken together, which are consistent, is that he had worked there for eight and a half years up to the point a year before he no longer violated that procedure. For the last year, he had followed that procedure. Now, Mr. Cole testified that he never followed up on in the past. Mr. Cole did admit, however, that what Mr. Gray, the appellant, told him was that he had been guilty of that in the past. So the appellant's testimony and the decisionmaker's testimony are consistent with respect to the fact that it was a declaration that in the past he had been guilty of those violations. In addition, still responding to your question, Judge Fletcher, is that, according to the plaintiff, Mr. Cole told him on February 12th, I believe, in a telephone call, that the investigation was demonstrating that no one followed the procedure and that now they were going to have to follow that procedure. And that suggests that, although in writing, as you pointed out, Judge Fletcher, the record is clear and we don't dispute it, that there was a very clear lotto lockout-hagout policy. No doubt about it. And he was treated to that. And, in fact, someone else had been terminated for not following that, correct? Well, that – when that happened is unclear. That's the – that particular person is named Sandeen. And that particular person, if you look at the testimony of the plaintiff regarding that, he's being asked the questions by appellee's counsel at the deposition, of course. And at ER 251, the plaintiff is asked – the appellant is asked about that. And he did hear about that at a later time after it had happened, after – long after it had happened, I think he said. And he also said that he couldn't pinpoint when in time she'd been fired. So we don't really know when that is and how that is. And at ER 248 through 251, if you look, you'll see the plaintiff being asked questions about others. And he identifies specifically – counsel identifies specific people by name, not only Sandeen but two others, who apparently had suffered some discipline or had been caught with violations of lotto policies. Yet those other two people had not been terminated. Sandeen was. The follow-up questioning regarding Sandeen at ER 248 to 251 was, counsel said, wasn't she fired for a communication problem? And he didn't know it. But the question is, not that it was violation of lotto. The question was, wasn't it a communication problem? Now, that could be inferred that a communication problem led to the violation of the lotto. But I don't think that makes any sense when we have clear evidence just with the plaintiff himself as to what the company does to inform each individual who's going to be working on that machine that lotto is very important. We also have Mr. Snell's statement during the investigation. Mr. Snell, Tony Snell, he told Mr. Cole, and I asked Mr. Cole about this at his deposition. He told Mr. Cole that others had violated that policy. The other shifts had violated that policy. And so we have evidence of pretext right there. Then we go to Mr. Christie. Now, remember, in context of framing the facts, I told you that back in May of 2004, Christie and Sherry Green had been involved with inappropriate behavior in the workplace that Mr. Gray had reported. So Mr. Christie already has an ax to grind, because by the appellee's own admission, Mr. Christie had suffered discipline because of Mr. Gray's report in May of 2004. So we have a disgruntled Mr. Christie on the hot seat because he's being investigated for trying to start a fight with the appellant. Now, he's found the appellant's found innocent of that, but the employer goes on to choose to believe Mr. Christie about a story about being on the line with plaintiff, the appellant, Mr. Snell, and Mr. Christie. Now, Mr. Cole testified that he talked to Mr. Christie. Kennedy. Who was the decision-maker? Who was the decision-maker? I believe the record demonstrates that it was a collaborative effort. Mr. Cole was the front person who made the decision in consultation with Page Connor. I believe that's the evidence, Your Honor. So Mr. Cole is the person I'm talking about who's telling us in his deposition that Mr. Snell was in the control room on this particular occasion. He had a broken leg, and according to Mr. Snell, he didn't see what happened on the line. I asked Mr. Cole, well, if he's in the control room, can he see? Well, yes, he can see. So what do you do with that evidence? I don't know. But the point is, forget about Mr. Snell. Cancel him out. You've got the testimony or the statements given to the employer of two witnesses to that occasion. Did the district judge get the timing wrong in his order and opinion, in your opinion? He states the time frame of the events. Is it accurately stated in his opinion? Court's notice? The court below, Judge Hicks. Yes, Judge Hicks. Is his – is it factually correct is what I want to know. Well, I don't know. To be candid with Your Honor, I don't know. I haven't – I didn't read it with that, getting ready for argument, with that in mind. All I can say is that the district court found that temporal proximity wasn't close enough and that temporal proximity alone wouldn't do it, and that we presented virtually no other evidence to demonstrate causation. And I've already discussed the evidence that we presented. So I think the district court got that wrong. And he got the temporal conclusion wrong. Well, I think that this Court's precedent, granted the Breeden case, Breeden v. Clark County, says that in that particular instance, her perception of retaliation was reasonable because it was one incident and the proximity has to be very close. I would submit that that is dicta with respect to the timing in that particular case, and this Court's clear precedence in the answering brief, they say, well, those are First Amendment cases. Can I rewatch your time there? I am, Your Honor. I have 10 seconds remaining. I'd like to reserve that for rebuttal. Thank you. Sure. Good morning, Your Honors. David Flores here for Defendant Master Foods. And with me is Lori Brown from our Las Vegas office. A couple things. One, regarding the termination, the evidence is quite clear that the plaintiff admitted that he had violated a lockout-tagout. It was a zero-tolerance safety rule, highly important to protect the safety of not just the plaintiff, but of other employees at the site. Is there evidence that others had violated the rule but not been terminated? There were several that had been investigated and suspended during the course of the investigation. And one person, it was determined that the machine that she had been working on that was not locked out was not capable of being locked out. The other person had not been trained in lockout-tagout. She was new, he or she was new, and therefore it was determined that lockout-tagout did not yet apply to her because she had not been trained. The only proper person who was in a similar position to the plaintiff was the person referred to, named Sandeen, and that person was terminated for violating lockout-tagout. And that person had no protected activity. And I'd refer the Court to the Sneed case, which says that if there's a similarly situated person who is treated similarly, that negates any inference of pretext. The plaintiff's counsel referred to the contention by plaintiff now that, well, all he admitted was that he had violated lockout-tagout in the past. Well, that's not what his NERC charge says. His NERC charge says specifically that I don't always lock out all the time, present tense. But it's largely a red herring because the lockout-tagout policy at Master Foods became zero tolerance as of 2001. So even if you assume the correctness of the plaintiff's position that the last time he didn't lock out a machine was one year before the termination in February 2005, he was still under the lockout-tagout zero tolerance rule. He had failed to lock out within the time frame of the zero tolerance rule. Another thing plaintiff contends is that during the course of the investigation that others had contended that they didn't follow, that there were people who didn't follow the policy. This was investigated by Master Foods by Mr. Cole, and it was determined that he went around and interviewed every single other operator, and every single other operator demonstrated, one, that that operator could lock out the machine, and, two, that they said that they always locked out the machine. They also stressed how important it was to lock out this particular machine that the plaintiff was operating, which was a knife extruder, highly dangerous if it's not locked out. Therefore, Master Foods had no reason or basis to conclude that anyone else was not locking out the machine. Was there a loss? Was there a loss connected with the event that did not result in a lockout? Did they lose some product or money? Did not lose any product or money during the course of that issue. We had lost product and money due to plaintiff's failure to follow procedures and notify management of a problem with a machine at the time he was assigned. That was not part of the lockout scenario, though. No. There was a loss that led to a suspension in 2004. And what's the chronology again in terms of the confirmation of the failure to lock out and the termination? The chronology of plaintiff's failure to lock out. Plaintiff contends, now contends, that he only admitted that he locked out, that he had failed to lock out in the past. And in his deposition, he contends that the last time he failed to lock out was a year before the termination. What triggered the investigation of lockout, the lockout practices? What triggered that? The lockout-tagout issue was triggered by an identification by Dave Christie, a co-employee during the course of an investigation of Mr. Christie's getting into an altercation with plaintiff. A side note to that, the altercation was investigated and Mr. Christie was disciplined. Mr. Christie suggested to Master Foods at the time of that investigation that plaintiff was not locking out. And Master Foods, thereupon, investigated the allegation and plaintiff admitted that he was not always locking out. The Christie identification was not the basis on which plaintiff was terminated. It was plaintiff's admission that he did not lock out. I guess what I was perhaps inartfully trying to get at is at the time of plaintiff's admission as a result of this investigation, what was the time lag between that and the termination? I think it was a matter of several weeks. I think he admitted that in early February, and I think the termination came at the end of February. Plaintiff referred to Mr. Snell in an allegation that Mr. Cole admitted that no one was locking out. We suggest to you that that is not what Mr. Cole said. The investigative notes that Mr. Cole wrote indicate that that was plaintiff's allegation. But Mr. Cole investigated and determined that everyone else was locking out, and therefore plaintiff's allegation was determined to be completely unfounded. As for Mr. Snell's comment, we submit that that was based on double or triple hearsay and inadmissible and also completely unfounded because Master Foods investigated that and determined that everyone else was locking out. In short, between plaintiff's admission that he did not lock out and the fact that others who were in similar positions to him and were terminated, I think that disproves any evidence of pretext. As to the prima facie case, Your Honor asked about whether the district judge got the timing right. The correct timing was plaintiff filed his NERC charge in July of 2004. The termination occurred in February 2005. The period of time was a period of seven months. We suggest that the Breeden case signed by the Supreme Court, and this is not dicta because it's been relied on by other courts in their holdings regarding the prima facie case, the Breeden case stated that for the timing of loan inference to apply to determine that plaintiff's met his burden of causation, the timing between the protected activity and the adverse action must be, quote, very close, as in a matter of several days. That's the case that the Breeden court approvingly cited. And the Breeden court cited two other cases in which it cited these approvingly. The timing was three to four months between the protected activity and the adverse action, and there was no evidence of no finding of causation. Therefore we have cases following that. We have cases with, say, three to eight months. And we have another case that says 11 months is all right. And so and that there's no per se rule as to how long the lag time can be. I think if those, I'm not sure which ones, if those are the cases that the plaintiff referred to in his brief, I believe that those were constitutional right cases that were not necessarily bound by Breeden, which is a Title VII case. And I would suggest to you that the Breeden case would be the controlling authority on that, and the Cornwall case in this circuit followed Breeden in, or at least adhered to the rule. I don't know if it came after. But it said that seven to eight months was too much time for the timing of loan inference to apply. So we would distinguish those other cases on the basis that they're not Title VII cases, not necessarily bound by Breeden. Counsel, I would suggest that these cases are all very fact-specific and that there isn't any bright-line rule. It depends upon the facts of each particular case. That's probably true, Your Honor. I would suggest that what's, for the purpose of the timing of loan inference, if there's other facts or circumstances that apply in the case, you might be taken out of the timing of loan analysis. But when a plaintiff is relying solely on timing between the protected activity and the adverse action and nothing else, then we would submit that the Breeden decision does apply and suggest that if you're talking about a substantial amount of time, i.e., three to four months, the timing of loan inference doesn't apply. In any case, the timing between plaintiffs' filing of the loan inference and the NERC charge and the termination was seven to eight months, and under established Title VII authority in this circuit, Cornwell, that's way too long to establish timing of loan inference. Thank you. Thank you, Your Honors. Thank you. To suggest there's a difference between timing based upon whether it's versus them and retaliation or Title VII retaliation makes no sense. If it's retaliation, it's retaliation. And the law, Coe-Salter v. City of Salem says that we borrow Title VII in retaliation cases. So Coe-Salter adopted Ray v. Henderson, Title VII analysis, and so their crossover and the Court can refer to those. Thank you. E.R. 57 is there. We have your points in mind and your time has expired. I appreciate your argument from both counsel. Thank you. The case of Ray v. Master Foods is submitted.
judges: Fletcher, McKeown, Hart